1  PHILLIP A. TALBERT
   United States Attorney
2  KATHERINE T. LYDON
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone:  (916) 554-2700
   Facsimile:   (916) 554-2900
5
6  TODD KIM
   Assistant Attorney General
7  KRISHNA S. DIGHE
   Senior Counsel
8  STEPHEN J. FOSTER
   Trial Attorney
9  Environmental Crimes Section, U.S. Dept. of Justice
   150 M Street NE
10 Washington, DC 20002
   Telephone: (202) 305-0321
11
12 Attorneys for Plaintiff
   United States of America
13
14              IN THE UNITED STATES DISTRICT COURT
15              EASTERN DISTRICT OF CALIFORNIA
16

| | |
|---|---|
| 17  UNITED STATES OF AMERICA, | CASE NO. 2:23-CR-168 JAM |
| 18                    Plaintiff, | |
| 19                    v. | PLEA AGREEMENT |
| 20  SINISTER MFG. COMPANY, INC., | |
| 21  fka SINISTER MFG. COMPANY, LLC., and dba SINISTER DIESEL AND | |
| 22  MKM CUSTOMS, | |
| 23                    Defendant. | |

24

25              I.    **INTRODUCTION**

26    A.    <u>Scope of Agreement.</u>

27        The Information in this case charges the defendant, SINISTER MFG. COMPANY, INC.,

28  formerly known as SINISTER MFG. COMPANY, LLC, and doing business as SINISTER DIESEL

and/or MKM CUSTOMS ("SINISTER"), with violations of 18 U.S.C. § 371 – conspiracy to violate the Clean Air Act and to defraud the United States ("Count One") and 42 U.S.C. § 7413(c)(2)(C) – tampering with a monitoring device or method required under the Clean Air Act ("Count Two").  This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California and the Environmental Crimes Section of the Environment and Natural Resources Division (collectively, the "government" or the "United States") and the defendant regarding this case.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and the Environmental Crimes Section of the Environment and Natural Resources Division and cannot bind any other federal, state, or local prosecuting, administrative, civil enforcement, or regulatory authorities.

### B.   Court Not a Party.

The Court is not a party to this plea agreement.  Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of the defendant, including activities which may not have been charged in the Information.  The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statutes, the defendant cannot, for that reason alone, withdraw its guilty plea, and it will remain bound to fulfill all of the obligations under this plea agreement.  The defendant understands that neither the prosecutors, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence it will receive.

## II.   DEFENDANT'S OBLIGATIONS

### A.   Guilty Plea.

The defendant will plead guilty to Counts One and Two.  The defendant agrees that it is in fact guilty of these charges and that the facts set forth in the Factual Basis for Pleas attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of

the record of the case.  The defendant understands and agrees that it will not be allowed to withdraw its pleas should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by it in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement.  The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

**B.    Fine.**

The defendant agrees to pay $500,000 as a criminal fine.  The defendant agrees the fine will be apportioned between the counts as follows: for Count One (conspiracy) the defendant will pay $250,000; and for Count Two (tampering) the defendant will pay $250,000.  Payment of the fine shall be by cashier's or certified checks made payable to the Clerk of the Court.  Defendant agrees payment shall be made in three installments, as follows:

1)    The first payment, of $166,666.67, will be made within one week of entry of plea.

2)    The second payment, of $166,666.67, will be made within one year of entry of plea.

3)    The third and final payment, of $166,666.66, will be made within two years of entry of plea.

The defendant further agrees that it will not seek to discharge the obligation to pay any part of this criminal fine in any bankruptcy proceeding.

The defendant understands that this plea agreement is voidable at the option of the government if the defendant fails to pay the stipulated fine as required by this plea agreement.

The defendant further acknowledges that this criminal fine will be in addition to the $500,000 civil penalty amount it will be obligated to pay pursuant to the civil Consent Decree entered into by the defendant and the Department of Justice ("Consent Decree"), attached hereto as Exhibit B.

The parties agree that the criminal fine and civil penalty amounts are negotiated figures based on the defendant's current ability to pay.

C.      **Special Assessment.**

The defendant agrees to pay a special assessment of $800 ($400 per count) at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing.  The defendant understands that this plea agreement is voidable at the option of the government if the defendant fails to pay the assessment prior to that hearing.

D.      **Violation of Plea Agreement by Defendant/Withdrawal of Pleas.**

If the defendant, cooperating or not, violates this plea agreement in any way, withdraws its pleas, or tries to withdraw its pleas, this plea agreement is voidable at the option of the government.  If the government elects to void the Agreement based on the defendant's violation, the government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein.  A defendant violates the plea agreement by committing any crime or providing or procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in any litigation or sentencing process in this case, or engaging in any post-plea conduct constituting obstruction of justice.  Varying from stipulated Guidelines application or agreements regarding arguments as to 18 U.S.C. § 3553, as set forth in this Agreement, personally or through counsel, also constitutes a violation of the plea agreement.  The government also shall have the right (1) to prosecute the defendant on any of the counts to which it pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement.  The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge.  The decision to pursue any or all of these options is solely in the discretion of the government.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision.  Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such

1   counts including, but not limited to, any statutes of limitation or any objections based on the Speedy

2   Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as

3   of the date of this plea agreement.  The determination of whether the defendant has violated the plea

4   agreement will be under a probable cause standard.

5   In addition, (1) all statements made by the defendant to the government or other designated law

6   enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,

7   whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or

8   administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no

9   claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal

10  Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by

11  the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed.

12  By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

13  **E.     Asset Disclosure.**

14  The defendant agrees to make a full and complete disclosure of its assets and financial condition,

15  and will complete the United States Attorney's Office's "Authorization to Release Information" and

16  "Financial Affidavit" within three (3) weeks from the entry of the defendant's guilty plea, including

17  supporting documentation.  The defendant also agrees to have the Court enter an order to that effect.

18  The defendant understands that if it fails to complete truthfully and provide the described documentation

19  to the United States Attorney's Office within the allotted time, it will be considered in violation of the

20  Agreement, and the government shall be entitled to the remedies set forth in section II.D above.

21  **F.     Probation.**

22  The defendant agrees to recommend it be placed on organizational probation for a minimum

23  period of three years from the date of sentencing pursuant to 18 U.S.C. § 3561(c)(1) and U.S.S.G.

24  §§ 8D1.1 and 8D1.2.  The terms of probation shall include the following specific provisions, in addition

25  to the Court's standard conditions:

26

27

28

PLEA AGREEMENT                                        5

1)     No further environmental violations.  Defendant will commit no further violations of federal state, and local environmental laws.

2)     Payments.  Defendant shall make payment in full of the monetary amounts set forth herein.

3)     Environmental compliance. Defendant shall fully comply with the civil Consent Decree. Any reports or notifications required by the Consent Decree or this Agreement shall be submitted simultaneously via electronic means by Defendant to all undersigned government counsel.

**G.    Corporate Authorization.**

The defendant represents that it is authorized to enter this plea agreement.  At the time of signing, the defendant shall provide to the United States a written corporate resolution, to be filed with the Court, in the form of notarized legal documents certifying that the defendant is authorized to enter into and comply with all of the provisions of this plea agreement.  The resolutions shall certify that all corporate formalities have been observed.  A duly authorized corporate officer will attend the entry of plea and sentencing hearings.

## III.    THE GOVERNMENT'S OBLIGATIONS

**A.    Dismissals/Other Charges.**

The government agrees not to bring any other charges arising from the conduct outlined in the Factual Basis attached hereto as Exhibit A.

**B.    Recommendation as to Fine Amount.**

The government agrees to recommend the stipulated criminal fine of $500,000, as described above in section II.B.

**C.    Probation.**

The government agrees to recommend the defendant be placed on organizational probation for a minimum period of three years from the date of sentencing pursuant to 18 U.S.C. § 3561(c)(1) and U.S.S.G. §§ 8D1.1 and 8D1.2.  The terms of probation shall include the specific provisions set forth above in section II.F in addition to the Court's standard conditions.

**D.    Use of Information for Sentencing.**

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate

statements or arguments by the defendant, its attorney, Probation, or the Court.  The defendant also understands and agrees that nothing in this plea agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

## IV.     ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offenses to which the defendant is pleading guilty.  With respect to Count One, conspiring to violate the Clean Air Act and defraud the United States in violation of 18 U.S.C. § 371, the elements are:

1. Beginning on or about March 3, 2010, and ending on or about April 30, 2020, there was an agreement between two or more persons to commit at least one crime as charged in the Information;

2. The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

3. One of the members of the conspiracy performed at least one overt act within five years prior to the filing of the Information for the purpose of carrying out the conspiracy.

With respect to Count Two, the defendant aided and abetted a person in tampering with a monitoring device or method required under the Clean Air Act.  With respect to the crime of tampering with a monitoring device or method required under the Clean Air Act, the elements are:

1. The defendant was a person;

2. The defendant tampered with or rendered inaccurate a monitoring device or method;

3. The monitoring device or method was required under the Clean Air Act; and

4. The defendant acted knowingly.

With respect to aiding and abetting liability, the elements are:

1. Someone else committed the crime of tampering with a monitoring device or method under the Clean Air Act;

2. The defendant aided, counseled, commanded, induced, or procured that person with respect to at least one element of tampering with a monitoring device or method required under the Clean Air Act;

PLEA AGREEMENT          7

3.   The defendant acted with the intent to facilitate the crime of tampering with a monitoring device or method required under the Clean Air Act; and

4.   The defendant acted before the crime was completed.

The defendant fully understands that, pursuant to 18 U.S.C. § 2(a), whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

The defendant fully understands the nature and elements of the crimes charged in the Information to which it is pleading guilty, together with the possible defenses thereto, and has discussed them with its attorney.

## V.   MAXIMUM SENTENCE

### A.   Maximum Penalty.

The maximum statutory sentence with respect to Count One is a fine of $500,000 or twice the gross gain or loss from the offense (per 18 U.S.C. § 3571), a five-year period of organizational probation, and a special assessment of $400.  The maximum statutory sentence that the Court can impose on the defendant with respect to Count Two is a fine of $500,000 or twice the gross gain or loss from the offense (per 18 U.S.C. § 3571), a five-year period of organizational probation, and a special assessment of $400.

### B.   Violations of Probation.

The defendant understands that if it violates a condition of probation at any time during the term of probation, the Court may extend the term of probation, impose more restrictive conditions of probation, or revoke probation and resentence the organization.

## VI.   SENTENCING DETERMINATION

### A.   Statutory Authority.

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence.  The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence.  The defendant further understands that the Court, after consultation and consideration of the Sentencing

1    Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. §
2    3553(a).

3         The defendant understands and acknowledges that the Sentencing Guidelines, including Chapter
4    Eight that provides guidance for the sentencing of corporate defendants, will be considered by the court
5    except U.S.S.G. §§ 8C2.1 through 8C2.9, which do not apply to cases involving environmental crimes.
6    Instead, the fine is to be determined under 18 U.S.C. §§ 3553 and 3572.  All other sections of Chapter
7    Eight of the Sentencing Guidelines that are applicable to corporate defendants are applicable to this case,
8    including provisions for probation.  As stated above, both parties jointly agree to recommend that the
9    Court order the defendant to pay the stipulated criminal fine of $500,000 (in addition to the $500,000
10   civil penalty amount that the defendant will be required to pay pursuant to the Consent Decree) and
11   jointly agree to recommend that the Court place the defendant on organizational probation for a
12   minimum period of three years from the date of sentencing.

13                                      **VII.     WAIVERS**

14        **A.     Waiver of Constitutional Rights.**

15        The defendant understands that by pleading guilty it is waiving the following constitutional
16   rights, to whatever extent they apply to a corporation:  (a) to plead not guilty and to persist in that plea if
17   already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed
18   if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims,
19   constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or
20   could be filed; (e) to subpoena witnesses to testify on its behalf; (f) to confront and cross-examine
21   witnesses against it; and (g) not to be compelled to incriminate itself.

22        **B.     Waiver of Appeal and Collateral Attack.**

23        The defendant understands that the law gives the defendant a right to appeal its guilty pleas,
24   conviction, and sentence.  The defendant agrees as part of its pleas, however, to give up the right to
25   appeal the guilty pleas, conviction, and the sentence imposed in this case as long as the sentence does
26   not exceed the statutory maximums for the offenses to which it is pleading guilty.  The defendant
27   understands that this waiver includes, but is not limited to, any and all constitutional and/or legal
28   challenges to the defendant's convictions and guilty pleas, including arguments that the statutes to which

defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this Agreement is insufficient to support the defendant's pleas of guilty. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty pleas, convictions, or sentence, except for non-waivable claims.

Finally, the defendant gives up any right to withdraw its pleas or seek to vacate its convictions based on any changes in the law after the execution of this plea agreement, as it agrees its conduct was unlawful at the time it occurred.

Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever attempts to vacate its pleas, dismiss the underlying charges, or modify or set aside its sentence on any of the counts to which it is pleading guilty, the government shall have the rights set forth in Section II.D herein.

### C.    Waiver of Attorneys' Fees and Costs.

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).

### D.    Waiver of Venue

The defendant understands that as to each count charged against it, the law gives it a right to a trial in the state and district where the count was allegedly committed. To the extent it is applicable, the defendant agrees to waive this right and any and all objections as to venue for the charges filed in this

1    case.

2         **E.      Waiver of Indictment**

3         To the extent the defendant has any rights under the United States Constitution to be indicted by

4    a grand jury on the charges to which it is pleading guilty, it agrees pursuant to Fed. R. Crim. P. 7(b) to

5    waive any and all rights it has to being prosecuted by way of indictment to the charges set forth in the

6    Information.  The defendant agrees that at a time set by the Court, it will sign a written waiver of

7    prosecution by indictment and consent to proceed by Information rather than by indictment.

8                        **VIII.      ENTIRE PLEA AGREEMENT**

9         Other than this plea agreement, no agreement, understanding, promise, or condition between the

10   government and the defendant exists, nor will such agreement, understanding, promise, or condition

11   exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and

12   counsel for the United States.

13                      **IX.      APPROVALS AND SIGNATURES**

14        **A.      Defense Counsel:**

15        I have read this plea agreement and have discussed it fully with my client.  The plea agreement

16   accurately and completely sets forth the entirety of the agreement.  I concur in my client's decision to

17   plead guilty as set forth in this plea agreement.

18   Dated:  5-31-23

19                                              BRIAN STRETCH
                                                Attorney for Defendant

20

21

                                                                              KTL
                                                                              6/1/23

22        **B.      Defendant:**                                Company

23        I have been authorized by a corporate resolution of defendant SINISTER MFG., INC., formerly

24   known as SINISTER MFG. COMPANY, LLC, and doing business as "SINISTER DIESEL" and/or

25   "MKM CUSTOMS" ("SINISTER") to sign this plea agreement.  On behalf of SINISTER, I have read

26   this plea agreement and carefully reviewed every part of it with SINISTER's attorney.  SINISTER

27   understands this agreement and voluntarily agrees to it.  Further, SINISTER has consulted with its

28   attorneys and fully understands its rights with respect to the provisions of the Sentencing Guidelines that



1   may apply to its case. No other promises or inducements have been made to SINISTER, other than

2   those contained in this plea agreement. In addition, no one has threatened or forced SINISTER in any

3   way to enter into this plea agreement. Finally, SINISTER is satisfied with the representation of its

4   attorney in this case.

5   Dated: 5-31-23

6                                                SINISTER MFG. COMPANY, INC.
                                                 By Chief Executive Officer and authorized
7                                                representative, Brian George
                                                 Defendant
8

9      **C.**   <u>**Attorneys for United States:**</u>

10     I accept and agree to this plea agreement on behalf of the government.

11

12  Dated: 6/27/23                               PHILLIP A. TALBERT
                                                 United States Attorney
13

14                                               KATHERINE T. LYDON
15                                               Assistant United States Attorney

16

17                                               TODD KIM
                                                 Assistant Attorney General
18                                               Environment and Natural Resources Division

19
                                                 KRISHNA S. DIGHE
20
                                                 Senior Counsel
21                                               Environmental Crimes Section

22

23                                               STEPHEN J. FOSTER
                                                 Trial Attorney
24                                               Environmental Crimes Section

25

26

27

28

                                                 12

EXHIBIT "A"
Factual Basis for Pleas

Were this matter to proceed to trial, the United States would prove the following beyond a reasonable doubt:

### *Introduction*

From its incorporation on March 3, 2010, through today, SINISTER MANUFACTURING COMPANY, INC., formerly known as SINISTER MFG. COMPANY, LLC, and doing business as SINISTER DIESEL and/or MKM CUSTOMS ("SINISTER") has been a business incorporated in California and located in Roseville, California.  SINISTER did business throughout the United States, including in the Eastern District of California.  From SINISTER's incorporation until April 30, 2020, SINISTER manufactured and sold parts intended to be installed on a motor vehicle to enable removal or disabling of the vehicle's emissions control system.  SINISTER often sold "hard part" delete products as part of "delete kits," and sometimes sold them in bundles with "tuners" and/or "tunes" manufactured by other companies. "Tunes" were, generally, alterations to the electronic code that vehicles use to control, among other things, fuel delivery, power parameters, and emissions.  "Delete tunes" were software programs that enabled a "deleted" diesel truck—a motor vehicle that has had its emissions controls removed or disabled—to run seemingly normally.

Throughout the conspiracy, SINISTER was located in Roseville, California.  SINISTER was a mid-size company with approximately 36 employees.  SINISTER was well known for selling exhaust gas recirculation ("EGR") delete kits. SINISTER EMPLOYEES A and B were responsible for making the key business and financial decisions for SINISTER.

### *Background*

"Deleting" a vehicle means to remove a vehicle's emissions control equipment, installed by the vehicle's manufacturer to meet emissions limits required under the Clean Air Act.  For diesel engines, this equipment often includes a diesel particulate filter ("DPF"), a selective catalytic reduction ("SCR") system, an EGR system, and a diesel oxidation catalyst ("DOC").  Many of those emissions controls are housed in the vehicle's exhaust pipe, so the first step of deleting a vehicle is often to remove the exhaust pipe.  Drivers seek to remove emissions controls for reasons that include increasing horsepower/performance and avoiding maintenance costs.

However, vehicles are designed to not run properly with the emissions components removed.  When the above-mentioned emissions controls are removed, the vehicle's On-Board Diagnostic System ("OBD") will detect and flag a malfunction in the emissions controls.[1]  The OBD will then activate the check engine light and/or another malfunction indicator light and may put the vehicle into "limp mode," which prevents the vehicle from running normally.

After removing a vehicle's emissions systems, three broad categories of products are necessary to make the vehicle run, all of which are referred to as "delete devices" or "defeat devices":

---

[1] The OBD is a monitoring device or method required under the Clean Air Act.  *See* 42 U.S.C. § 7521(m)(1); 40 C.F.R. §§ 86.010-18 and 86.1806-05.

1) Hard parts, often sold as part of "delete kits." A delete kit would include all hard parts needed to delete a vehicle. The simplest example of a delete hard part is a "straight pipe" (a replacement for the original exhaust pipe with all of the emissions controls removed).

2) Software known as "delete tunes." Delete tunes tamper with the OBD's monitoring function by tricking the OBD to prevent it from detecting the removal of emissions controls and thus enabling the vehicle to continue to operate as though its emissions controls remained installed.

3) A "tuner" or tuning platform to run or install the delete tunes, which can be a physical box/device or a cloud-based system. A tuner or tuning platform interfaces with the vehicle's computer and OBD that control and monitor various vehicle functions.

Deleting a truck causes its emissions to increase dramatically. For example, for a fully deleted truck which has had all emissions equipment removed, United States Environmental Protection Agency ("EPA") testing quantified the increased emissions as follows: NOx increased 310 times, non-methane hydrocarbons increased 1,400 times, carbon monoxide emissions increased 120 times, and particulate matter increased 40 times. Partial deletions (short of a full delete) may yield smaller emissions increases. EPA's Air Enforcement Division released a report in November 2020 finding that more than half a million diesel pickup trucks in the United States—approximately 15% of all diesel trucks that were originally certified with emissions controls—have been illegally deleted.

Diesel emissions include multiple hazardous compounds and deleteriously impact human health and the environment. Diesel emissions have been found to cause and worsen respiratory issues like asthma and lung cancer. One study indicated that 21,000 American deaths annually are attributable to diesel particulate matter soot. Exposure to polluted air *in utero* has been associated with a host of problems with lifelong ramifications including low birth weight, preterm birth, autism, brain/memory disorders, and asthma.

*Count One – Conspiracy to violate the Clean Air Act and defraud the United States (18 U.S.C. § 371)*

With respect to Count One, from March 3, 2010, through April 30, 2020, SINISTER, through its agents and employees, formed agreements, within and outside SINISTER, to violate the Clean Air Act in the Eastern District of California and elsewhere. Specifically, SINISTER agreed with certain employees, other individuals, and at least one company with whom it did business, to violate the Clean Air Act by selling delete kits and by selling other companies' delete tunes and tuners/tuning platforms which tampered with vehicles' OBDs and enabled deleted vehicles to run seemingly normally with their emissions controls removed. SINISTER also agreed with certain employees, other individuals, and at least one company with whom it did business, to defraud the United States by interfering with the EPA's lawful functions of limiting pollutants emitted into the air and ensuring compliance with the Clean Air Act. SINISTER agreed to do so by manufacturing and selling defeat devices, attempting to thwart EPA's detection through phone-only sales and removing violative products from its website, counseling customers on how to cheat emissions tests, and engaging in various artifices including pretending that its defeat devices were for off-road or race use only.

Through its employees, SINISTER reached agreements with other companies who manufactured tuners or tuning platforms to sell their products bundled together. SINISTER also formed agreements with end users to whom it sold delete kits, delete tunes, tuners, and other delete products. SINISTER

would often advise customers on what other parts they would need for their deleted vehicles to run properly with SINISTER's delete kits, such as a tuner/tuning platform and/or delete tunes. SINISTER was aware that the delete products it sold were used in connection with the removal of emissions control equipment and that the delete tunes it sold tampered with the monitoring function of OBDs. SINISTER was further aware that SINISTER products were used on public roads and that such use was widespread. At times, SINISTER characterized its delete products as for "racing" and/or included disclaimers in its marketing materials indicating that their products should be used only in off-road settings, but SINISTER knew the bulk of the market for its delete products were diesel truck drivers who used SINISTER products on public roads, not racetracks. SINISTER also counseled customers on how to evade state emissions tests.

SINISTER conspired with at least one company in the aftermarket delete device industry. As one example, SINISTER partnered with COMPANY A, a company based in Louisiana which produced custom delete tunes, whereby SINISTER sold COMPANY A's tunes to SINISTER customers. As a result, SINISTER often sold its own products to customers bundled with COMPANY A tunes (along with tuners or tuning platforms produced by other companies). Typically, SINISTER would bill the customer for the entire sale, including the delete tunes and tuner, and ship the hard parts directly to the customer. COMPANY A would send the tunes directly to the customer, either by loading them on the tuner or loading them to the tuning platform. One such tuning platform was produced by COMPANY B. COMPANY A would then bill SINISTER for those products. Between 2015 and 2019 alone, SINISTER paid COMPANY A more than a million dollars for such products. SINISTER also extensively sold a tuning platform produced by COMPANY B. On one December 2016 call between the President of COMPANY A and SINISTER EMPLOYEE C the two agreed regarding the COMPANY B tuning platform "that's where it's freaking at, it's awesome, it's amazing." SINISTER EMPLOYEE C noted he had been "trying to push that out" to one of his big accounts.

SINISTER was aware that other companies in the aftermarket defeat device industry chose to stop selling certain violative products in response to enforcement activity by the EPA. SINISTER, by contrast, continued selling violative products but strove to do so under the radar of the EPA by removing products from its website and selling over the phone. For example:

- In December of 2012, COMPANY C, a provider of one popular tuning platform, sent out an email notification that in future software releases "for USA based customers only, EGR and DPF related items will no longer be available for modification on supported Diesel platforms." COMPANY C further stated that "Recently the US EPA has made it known that removing the DOC and/or DPF is illegal on any vehicle that is road registered in the US, even if the vehicle is being used on private property." SINISTER EMPLOYEE B forwarded the email to SINISTER EMPLOYEE A with the comment: "Very interesting. Read below 'Recently the US EPA has made it known that removing the DOC and/or DPF is illegal' EGR not mentioned." [2] SINISTER EMPLOYEE A responded: "Yeah, sounds like if we avoid dpf stuff then carb[3] will be our only problem." SINISTER EMPLOYEE B wrote back: "I'm kinda thinking we take our dpf exhaust off the web soon," to which SINISTER EMPLOYEE A responded, "Yeah probably a good

---

[2] All quoted misspellings and grammatical errors appear this way in the original quoted documents, unless otherwise noted.

[3] "carb" refers to the California Air Resources Board.

idea." As described elsewhere, SINISTER continued to sell DPF delete products after they were removed from the website.

- On a recorded sales call in April of 2015, SINISTER EMPLOYEE D guided a customer through everything he would need to delete the DPF and EGR on his truck and tune his truck. SINISTER EMPLOYEE D explained that certain of the required products were not on SINISTER's website but SINISTER would sell them to him over the phone:

    the other parts you're looking for actually aren't online there, so we try not to advertise that we delete these, cause there's some issues with you know advertising that we're removing federal emissions equipment on the vehicles, the last thing we want to do is have our name out there, you know, if we're doing that, so that's something I can take care of for you over the phone here.

- In December of 2016, after SINISTER temporarily froze sales of certain delete products in response to an EPA inspection, a COMPANY A employee called SINISTER to inquire whether SINISTER would be selling COMPANY A delete tunes again. SINISTER EMPLOYEE C responded: "yeah I've been talking to [SINISTER EMPLOYEE B] over here. . . I don't think we're going to advertise, but we're gonna definitely start offering it again . . . At the end of the day it's his decision, but you know, I think we all kind of agreed on it. . . . I mean we're just not going to advertise the stuff on the website, but we're going to offer it to our cust – you know, a customer calls in and wants it, I got it."

- In May 2017, SINISTER EMPLOYEE B directed another SINISTER employee via email: "Let's just turn off the buy on line ability for the [COMPANY D brand tuner]."

SINISTER faced repeated enforcement actions from state and federal civil and criminal investigative and law enforcement authorities. Every year from 2015-2019, SINISTER had at least one key enforcement encounter and continued selling violative products throughout:

- On December 28, 2015, SINISTER entered a Settlement with the California Air Resources Board and agreed to pay a $651,450 penalty for violations. SINISTER admitted as part of the settlement that: "9. Between April 21, 2010 and December 1, 2012, Sinister sold, offered for sale, and/or advertised aftermarket parts capable for use on highway motor vehicles in California (hereinafter, "Subject Parts"). 10. The Subject Parts altered or modified the original design or performance of the motor vehicle pollution control device or system." In addition, SINISTER agreed to institute a buyback program as part of the settlement.
- On April 29, 2016, EPA Region 9 conducted an inspection of SINISTER's facility. Post-inspection, SINISTER responded by raising the price of EGR delete kits 25% - 45%.
- On June 30, 2017, EPA Region 9 sent SINISTER a Request for Information pursuant to Section 208(a) of the Clean Air Act.
- On June 5, 2018, EPA Region 9 sent SINISTER a Notice of Violation.
- On or about July 2, 2018, Sinister's in-house counsel met with EPA Region 9 regarding the Notice of Violation.
- On August 27, 2019, a federal criminal search warrant was executed at SINISTER's business premises.

On March 9, 2020, SINISTER executed a Stop Sale Commitment agreeing to stop the sale or manufacture of violative products no later than April 30, 2020.

SINISTER knew that its delete products violated federal law. SINISTER EMPLOYEE E admitted in April 2019 to an undercover agent posing as a dealer customer that, "Federally, everything is

A-4

illegal." SINISTER EMPLOYEE E went on to advise the undercover agent that he should employ disclaimers to push liability onto the end-user customer:

> You put it on the customer and let them know, and your receipts say that these are race-only and off-road use only parts. That takes a ton away from your plate. That's huge. It doesn't take everything away. But it takes a lot away. And it puts it on the customer, knowing, them knowing they're putting off road use only products on their truck.

SINISTER EMPLOYEE E further assured the undercover agent: "it's worth it to cover your butt." Recordings of SINISTER's sales calls reflect the strategy described by SINISTER EMPLOYEE E in use whereby, in some instances, SINISTER employees were careful with language and/or employed disclaimers in efforts to insulate SINISTER from liability.

A later document reflects that SINISTER knew that it could not shift liability onto the customer through disclaimers, given SINISTER's knowledge of how its products were actually used. An agenda from an internal "Race Use Only Product Review Meeting" in July of 2019 stated: "anyone can be found in violation of the EPA Act if they know, or have reason to know that the product is going to be used for purposes other than those intended. With or without such disclaimers, such knowledge = violation of the EPA Act."

Additionally, SINISTER took steps to avoid having knowledge that they were selling delete kits to everyday drivers, in an effort to maintain plausible deniability. For example, SINISTER EMPLOYEE B directed salespeople to stop asking the question "what do you do with the truck?" SINISTER had at one point required that question be asked on every call because it was a powerful selling question and enabled the salesperson to suggest additional products which might be helpful for particular truck uses, like towing or camping in hot weather. Salespeople understood that the reason for no longer asking the question was to avoid getting answers which indicated that the driver was going to use that truck on a regular highway and was not a racecar driver.

While SINISTER sometimes referred to delete tunes as "race" tunes or "off road" tunes, calls and emails reflect the vehicles which SINISTER's delete products were loaded onto were not racecars and were, instead, driven on public roads. SINISTER employees knew and discussed with customers that its delete products would be installed on the vehicles that customers drove on a daily basis. Some customers explained they needed delete tunes suitable for towing, which is inconsistent with racing use and an indication the tuned deleted vehicles would be used on public highways. Numerous written communications and phone calls explicitly or tacitly acknowledged that emissions controls would be removed from on-road, non-racing vehicles. For example:

- In October 2018, a customer called SINISTER on a recorded line seeking help with his "EGR problems" and explaining "to be honest, I'm not really trying to race with this thing, I'd like to get a little more, uh, power out of it but nothing crazy." He said he was looking at his options for "simple plug and play tuners" and asked what his best bet was. SINISTER EMPLOYEE F recommended a particular brand of tuner SINISTER offered for sale along with a COMPANY A custom tune. Later in the call, SINISTER EMPLOYEE F advocated for buying an EGR delete kit and deleting the EGR rather than buying a new stock EGR. With the caveat that, "they're all part of the emissions system obviously, these are all considered 'off-road products,'" SINISTER EMPLOYEE F noted "there are advantages to running that EGR delete. Obviously money is one, cost," and "it definitely helps with" better fuel economy.

- In December 2018, a customer emailed SINISTER that he had purchased a SINISTER EGR delete kit and requested instructions on how to get rid of the check engine light. The customer stated: "I'm not trying to tune my truck to be a 'hot rod' I just don't want the irritating light." SINISTER EMPLOYEE G replied that the customer would need a tuner and asked to call him to discuss further. The customer replied that he did not want to spend more than $200, and "I'm just trying to get rid of as much EPA crap that chokes the engine as possible. I'm not worried about any emission testing. I am installing a straight 5 inch exhaust pipe, an EGR delete and a DPF delete. I'm not looking to make any fancy racing truck. I just need the engine light off after I take off these 'chokes' off the engine." SINISTER EMPLOYEE G replied offering a COMPANY B device: "$1,299 for a single tune with delete and $1,499 for 5 tunes with a switch."
- In February 2019, a customer reached out to SINISTER via Facebook, writing: "I'm torn about what egr delete to go with in my 04 lly Duramax" and providing information about his truck. The customer stated he was only going to run about a 60 – 100 horsepower tune "so I'm not trying to build a race truck." SINISTER replied: "Talk to one of our sales techs" and provided the phone number.
- In August 2019, on a recorded sales call, SINISTER EMPLOYEE H talked a customer through a Ford F-250 "delete project." SINISTER EMPLOYEE H stated that due to "the nature of what it is" the DPF delete kit would not be on their website, "it's one of those things you've got to call in for it, we just don't advertise it online." The customer stated he also wanted a "towing tune" and "I'm not trying to race around."

Throughout the time period of the conspiracy, SINISTER's salespeople explained to end-user customers that installation of SINISTER's hard part delete products would require a delete tune as well as a tuning platform or tuner in order for the trucks to run properly, and the salespeople provided detailed assistance in supplying delete projects. SINISTER's customers relied on SINISTER for advice in crafting the best systems to delete their trucks. SINISTER salespeople, in turn, steered customers to purchase entire delete systems (including delete tunes and a tuner or tuning platform) along with the hard part delete kits. SINISTER sold hard parts it manufactured as well as ones manufactured by other companies. SINISTER profited from the sales of each of these delete products. Examples of these communications include the following:

- In October 2017, a Texas-based customer messaged SINISTER via Facebook seeking help with his Ford F-250, writing: "I need advice on what tuner, which exhaust, and deletes to run? . . . I trust you guys and your experience, any help would be very much appreciated and thank you in advance!" SINISTER instructed the customer to talk to a SINISTER sales representative directly. The customer replied: "Thank you so much!!! Ill give the number a call, thank you, you guy's are awesome!"
- In October 2017, a customer reached out to SINISTER via Facebook seeking advice on how to delete his Dodge Ram 2500, inquiring "if I put an EGR delete kit on it do I have to have it tuned to run properly? Or can I put it on and it will run fine as is?" SINISTER replied, "yes anytime you remove any kind of emission system off of the truck you will need to program the truck to no longer use it." SINISTER requested the customer's phone number to have a sales representative reach out.
- In December 2017, a customer reached out via Facebook looking for parts for his 2012 F-350, writing: "I have a delete kit and exhaust but still in need of a tuner." SINISTER responded: "Hey, one of our sales guys should be calling you any minute!"

PLEA AGREEMENT                                    A-6

- In January 2018, a customer with a 2014 Duramax crew cab sent SINISTER a Facebook message, indicating he wanted SINISTER's help and was "looking to delete the EGR, DPF, DEF systems off my truck." SINISTER replied: "One of our sales techs will be able to help you with the Duramax and I think that would be taken care of better over the phone."
- On a recorded call in November 2018, SINISTER EMPLOYEE I assisted a customer who called looking for an EGR delete kit. SINISTER EMPLOYEE I advised the customer needed a tuner too: "without a tuner you're going to throw a check engine light and the truck might run really poor."
- In February 2019, a customer inquired over Facebook: "Do you offer a full delete system and tuner for a 2016 duramax LML." SINISTER responded: "Yes. We can help with that. Please call in and chat with our sales reps. 877-976-8982."
- A SINISTER sales script directed salespeople to acknowledge that using an EGR delete kit could cause a check engine light. The sales team was instructed to suggest that this could be fixed with a particular brand of tuner with an EGR custom tune.

SINISTER provided support and instructions for how to install its delete kits. For example, in February 2019, a customer reached out seeking a video for how to install an EGR delete kit. SINISTER replied that it did not have a video at that time but sent a link to an instructional file on SINISTER's website and told the customer to, "Let me know if you want to talk to someone here about installing one as well."

During the time period of the conspiracy, as EPA increased enforcement and other companies in the aftermarket delete device industry halted sales of delete products, SINISTER saw an opportunity to increase sales. One March 2019 internal document reflected this SINISTER strategy of capitalizing on a changing industry, reporting: "Recently, [COMPANY E] announced they would no longer distribute their race products in the USA. This means Sinister products will be in high demand for our race products across the industry." An April 2019 sales report noted that the wholesale sales department "finished with a $6.3% increase ($532,512.61 vs. $500,838.19) over last year. . . We see a large increase in sales for 'off-road' products purchased from our WDs."[4] SINISTER delete products became increasingly profitable into the summer of 2019. A July 2019 sales report reflects EGR delete kits were SINISTER's top selling product and that SINISTER's sales were up nearly 18% over the same month in 2018.

---

[4] "WDs" refers to wholesale distributors.

SINISTER advertisements featured photographs reflecting some of the emissions impact of its delete products.  For example, SINISTER posted the following photograph of a truck "rolling coal" on its Facebook page in April of 2017 titled: "Get Serious.  Get Sinister."



SINISTER communicated with end user customers about evading state emissions tests after deleting their trucks:

- On an August 2015 recorded phone call, SINISTER EMPLOYEE J suggested a DPF delete and custom tunes to a customer who used his vehicle for towing.  SINISTER EMPLOYEE J suggested putting the DPF back on before going to inspections.  "You plug it in, tune it, emissions are off. You go back to inspection, put it back on, you bolt it on, you return the vehicle to stock, you're back to stock."
- A "Frequently Asked Questions" sales script found in the course of the federal search warrant executed on SINISTER's premises included the following:
    Q. "My state requires visual vehicle inspections.  Can I leave the Factory EGR in place for the visual inspection?"
    A. "Yes, the factory EGR can remain in place or be installed for the visual and then taken out."

SINISTER brought in significant revenue from delete products. For some years during the conspiracy, SINISTER made more than $20 million per year in gross sales, approximately 25% of which was derived from delete products.  According to sales statistics SINISTER reported to the EPA, in a less than two-year period between October 30, 2015, and July 17, 2017, SINISTER sold 39,792 defeat devices, including at least 35,960 EGR delete kits.

1

2

*Count Two - Tampering with a monitoring device or method required under the Clean Air Act (42 U.S.C. § 7413(c)(2)(C))*

3

4        Count Two is an example of one sales transaction that occurred in part in the state and Eastern District of California.  With respect to Count Two, on or about June 7, 2019, SINISTER sold an EGR delete kit produced by SINISTER to INDIVIDUAL A, located in Wisconsin, bundled with delete tunes produced by COMPANY A and the tuning platform produced by COMPANY B.  On a recorded sales call on or about June 6, 2019, INDIVIDUAL A explained he was looking for a SINISTER EGR delete kit.  SINISTER EMPLOYEE I suggested tuning from COMPANY B to "take care of the check engine light."  During the call, INDIVIDUAL A asked: "I know it's not supposed to be driven on the road and everything like that, but if it's tuned out and everything, it'll pass emissions, correct?" INDIVIDUAL A laughed, "we're not in California or nothing like that so we're not as hard, they're not going to open my hood or nothing like that."  SINISTER EMPLOYEE I said: "But these are for off road use only though, right?"  INDIVIDUAL A replied: "Well I'm, no, I'm going to be driving it on the street."  SINISTER EMPLOYEE I said, "Oh I can't [be] selling it to you man if you're going to be driving it on the street."  After a pause, INDIVIDUAL A said "well, I mean, you're not liable for it, I am, 'cause I'm putting it in, correct?"  SINISTER EMPLOYEE I explained "the regulations are getting more and more strict these days, and . . . imagine if they listened to my call and they see that I'm selling it to a truck that's driven on the street I'm still liable, the EPA's just getting stricter and stricter."  After another pause, INDIVIDUAL A said, "so I would have to just have to run this truck off road then, eh?" SINISTER EMPLOYEE I responded: "correct.  When you call in you have to make sure you, leave that out of whatever you're talking about."  INDIVIDUAL A then stated, "Okay, and I can take care of that."  On or about June 7, 2019, SINISTER proceeded to make the sale of the EGR delete kit, the COMPANY B tuning platform, and the COMPANY A delete tunes to INDIVIDUAL A.

5

6

7

8

9

10

11

12

13

14

15

16        SINISTER charged INDIVIDUAL A $2,581.99 in total, including $1,499.00 for the tunes and the tuning platform.  On or about June 7, 2019, COMPANY A billed SINISTER $999.99 for the tunes and the tuning platform.  At the request of SINISTER, COMPANY A shipped the tuner to INDIVIDUAL A on or about June 10, 2019.  A record check revealed the customer had a Ford 6.7L Powerstroke with a VIN ending in 3144.  On June 26, 2019, COMPANY B sent COMPANY A an automated email reflecting that a vehicle associated with that customer's first name and the vehicle's VIN had been associated with COMPANY A through a cloud-based platform.  The notes section of the email stated: "Full delete kit and wicked wheel."  Records from the cloud-based platform identify the following tunes as the "LAST INSTALLED ECU PROFILES" for INDIVIDUAL A:

17

18

19

20

21    • ECM Ford 11-12 6.7L PK. No Emissions. SOTF 0-150HP.V2.7.

22    • TCM Ford 11-12 6.7L PK. No Emissions. SOTF 0-150HP.V2.7.

23

24

25

26

27

28

1
    *As the authorized representative of Defendant SINISTER, I have carefully read and reviewed the*
*entire factual basis in Exhibit A above and discussed it with SINISTER's attorney. I hereby stipulate*
2
*that this factual basis is true and accurate to the best of my knowledge and that had the matter*
*proceeded to trial, the United States would have proved the same beyond a reasonable doubt. As far as*
3
*SINISTER's conduct is concerned, I adopt it as SINISTER's own true statement.*

4
Dated:   S. 31·23

5

6
                                 SINISTER MFG. COMPANY, INC.
                                   By Chief Executive Officer and authorized
7
                                   representative, Brian George
                                   Defendant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,       )

                     )   Case No. 2:23-cv-01580-JDP

          Plaintiff,   )

                     **)**   **CONSENT DECREE**

                     **)**

                     )

          v.           )

                     )

SINISTER MFG. COMPANY, INC.,   )

                     )

          Defendant.   )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TABLE OF CONTENTS

I.     JURISDICTION AND VENUE ......................................................................................... 2
II.    APPLICABILITY ............................................................................................................... 3
III.   OBJECTIVES ..................................................................................................................... 4
IV.    DEFINITIONS..................................................................................................................... 4
V.     CIVIL PENALTY.............................................................................................................. 11
VI.    COMPLIANCE REQUIREMENTS.................................................................................. 14
VII.   REPORTING REQUIREMENTS ..................................................................................... 20
VIII.  FAILURE TO COMPLY WITH CONSENT DECREE ................................................... 24
IX.    FORCE MAJEURE ........................................................................................................... 28
X.     DISPUTE RESOLUTION ................................................................................................. 30
XI.    INFORMATION COLLECTION AND RETENTION ..................................................... 32
XII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS .......................................... 34
XIII.  COSTS ............................................................................................................................... 36
XIV.   NOTICES........................................................................................................................... 36
XV.    EFFECTIVE DATE............................................................................................................ 37
XVI.   RETENTION OF JURISDICTION ................................................................................... 38
XVII.  MODIFICATION .............................................................................................................. 38
XVIII. TERMINATION ................................................................................................................ 38
XIX.   PUBLIC PARTICIPATION .............................................................................................. 39
XX.    SIGNATORIES/SERVICE................................................................................................ 39
XXI.   INTEGRATION ................................................................................................................ 40
XXII.  FINAL JUDGMENT ......................................................................................................... 40
XXIII. 26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION.............................................. 40
XXIV.  APPENDICES ................................................................................................................... 41

**WHEREAS**, Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a complaint in this action concurrently with this Consent Decree, alleging that Defendant, Sinister Mfg. Company, Inc. ("Sinister" or "Defendant"), violated Section 203(a)(3)(B) of the Clean Air Act ("Act"), 42 U.S.C. §7522(a)(3)(B).

**WHEREAS**, the Complaint against Defendant alleges that Defendant manufactured, offered for sale, sold, and/or installed at least 39,792 aftermarket automotive products, both hardware and software, designed to defeat emission controls between October 30, 2015, and July 17, 2017, in violation of Section 203(a)(3)(B) of the Clean Air Act, 42 U.S.C. § 7522(a)(3)(B). The Complaint alleges that Defendant manufactures, sells, and installs nationwide hardware and software that enable consumers to increase the power and performance of diesel trucks (hereinafter, "Aftermarket Performance Products").  The Complaint also alleges that in order to improve horsepower, torque, and other performance measures, many of these products defeat emission controls that help the vehicle meet emission standards for harmful pollutants, including oxides of nitrogen ("$NO_x$"), particulate matter ("PM"), carbon monoxide ("CO"), and non-methane hydrocarbons ("NMHCs").

**WHEREAS**, On March 9, 2020, Defendant provided a written, signed Stop Sale Commitment to the United States (the "Commitment") that it would, not later than April 30, 2020, stop the manufacture, sale, offering for sale, installation, and/or distribution of certain categories of products the United States alleges are illegal defeat devices, as set forth in the Commitment attached as Appendix A to this Consent Decree.  Defendant has provided quarterly certifications beginning on May 15, 2020, of its compliance with the Commitment.

**WHEREAS**, Defendant has asserted that it has a limited ability to pay a civil penalty and

1

has submitted Financial Information to the United States in support of that assertion. The United States has reviewed this Financial Information to determine whether Defendant is financially able to pay a civil penalty for the violations alleged in the Complaint. Based upon this Financial Information, the United States has determined that Defendant has limited financial ability to pay a civil penalty.

**WHEREAS**, by entering into this Consent Decree, Defendant makes no admission of law or fact with respect to the allegations in the Complaint and does not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint.

**WHEREAS**, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

**NOW, THEREFORE**, with the consent of the Parties, **IT IS HEREBY ADJUDGED, ORDERED, AND DECREED** as follows:

### I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section(s) 42 U.S.C. §§ 7523 and 7524, and over the Parties.

2.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C. §§ 1391(b)(2), 1391(c)(2), and 1395(a), as well as 42 U.S.C. § 7524, because it is the judicial district in which the Defendant is located, resides, is doing business, and/or in which a substantial part of the alleged violations in the Complaint occurred.

2

3.     For purposes of this Decree, or any action to enforce this Decree, Defendant and Guarantors consent to the Court's jurisdiction over this Decree and any such action and over Defendant and Guarantors and consent to venue in this judicial district.

4.     For purposes of this Consent Decree, Defendant agrees that the Complaint states claims upon which relief may be granted pursuant to Section 203(a)(3)(B) of the Clean Air Act ("Act"), 42 U.S.C. § 7522(a)(3)(B).

## II.     APPLICABILITY

5.     The obligations of this Consent Decree apply to and are binding upon the United States, upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law, and upon Guarantors for purposes of the Guaranty.

6.     No transfer of ownership or operation of Defendant or any business unit thereof, including without limitation any subsidiary of Sinister or d/b/a or license to use a Sinister d/b/a, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Decree are implemented, unless (a) the transferee agrees to undertake the obligations required by this Decree with respect to the transferred business unit, (b) the United States consents to relieve Defendant of its obligations required by this Decree with respect to the transferred business unit, which consent shall not be unreasonably withheld, and (c) the Court approves the substitution or addition of the transferee with respect to such obligations required by this Decree.  The United States may refuse to approve the substitution of the transferee for Defendant if it determines in the reasonable exercise of its discretion that the proposed transferee does not have the financial or technical ability to comply with the requirements of the Decree.  Defendant may challenge the United States' refusal using the Dispute Resolution procedures set forth in Section X (Dispute

3

Resolution).  At least 30 Days prior to such transfer, Defendant shall provide a copy of this

Consent Decree to the proposed transferee and shall simultaneously provide written notice of the

prospective transfer to EPA and DOJ, in accordance with Section XIV (Notices).  Any attempt to

transfer ownership or operation of Defendant or any business unit thereof, including without

limitation any subsidiary of Sinister, a Sinister d/b/a, or a license to use a Sinister d/b/a, without

complying with this Paragraph constitutes a violation of this Decree.

7.      Defendant shall provide a copy of this Consent Decree to all officers, employees,

and agents whose duties might reasonably include compliance with any provision of this Decree,

as well as to any contractor retained to perform work required under this Consent Decree.

Defendant shall condition any such contract upon performance of the work in conformity with

the terms of this Consent Decree.

8.      In any action to enforce this Consent Decree, Defendant shall not raise as a

defense the failure by any of its officers, directors, employees, agents, or contractors to take any

actions necessary to comply with the provisions of this Consent Decree.

### III.      OBJECTIVES

9.      The objective for this Consent Decree is to resolve the Defendant's civil liability

for the violations of Title II of the Clean Air Act alleged in the Complaint through the date of

lodging and to ensure that the Defendant complies after the Effective Date with Title II of the

Clean Air Act, including Section 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B).

### IV.      DEFINITIONS

10.      Terms used in this Consent Decree that are defined in the Act or in regulations

promulgated pursuant to the Act have the meanings assigned to them in the Act or such

4

regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions apply:

"Act" means the Clean Air Act, as amended, 42 U.S.C. § 7401 et seq.

"Authorized Dealer" means any third-party authorized by Defendant to sell products, including any wholesale distributor.

"Auxiliary Emission Control Device" or "AECD" shall mean any element of design of a Motor Vehicle or Motor Vehicle Engine that senses temperature, motive speed, engine revolutions per minute, transmission gear, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of a Motor Vehicle's emission control system.  See 40 C.F.R. § 1037.801.

"CARB Executive Order" or "CARB EO" means an official exemption issued by the California Air Resources Board ("CARB") exempting an aftermarket product from the prohibitions of Section 27156 of the California Vehicle Code upon review by CARB that the aftermarket product has been found not to reduce the effectiveness of the motor vehicle pollution control systems or to result in emissions from the modified or altered vehicle that are at levels that comply with existing state or federal standards for that model year of the vehicle being modified or converted.

 "Certificate of Conformity" or "COC" means a document EPA issues to ensure that every new motor vehicle or motor vehicle engine introduced into United States commerce satisfies applicable emission standards.

"Commitment" shall mean the Stop Sale Commitment signed by Defendant on March 9, 2020 and submitted to the United States that is attached as Appendix A.

"Complaint" means the Complaint filed by the United States in this action.

5

"Complete Application" means an application for a CARB Executive Order that has been submitted to CARB and contains all forms and information, including the results of emissions testing or engineering evaluation, required for CARB to fully evaluate and take final action on the application.

"Consent Decree" or "Decree" means this Decree and all appendices attached hereto (listed in Section XXIV).

"Covered Subject Product" means any Subject Product that is not an Excepted Subject Product.

"Day" means a calendar day unless expressly stated to be a business day.  In computing any period of time for a deadline under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period runs until the close of business of the next business day.

"Defendant" means Sinister Mfg. Company, Inc. d/b/a. Sinister Diesel.

"Diesel Oxidation Catalyst System" or "DOC" means any oxidation catalyst used to reduce emissions from diesel-fueled vehicles and equipment, including all hardware, components, parts, sensors, subassemblies, software, AECDs, and calibrations that collectively constitute the system for implementing this strategy.

"Diesel Particulate Filter System" or "DPF" means all hardware, components, parts, sensors, subassemblies, software, AECDs, calibrations, and other Emission-Related Elements of Design that collectively constitute the system for controlling emissions of particulate matter by trapping such particulates in a filter and periodically oxidizing them through thermal regeneration of the filter.

6

"DOJ" means the United States Department of Justice and any of its successor departments or agencies.

"Effective Date" means the definition provided in Section XV (Effective Date).

"Element of Design" is any control system (i.e., computer software, electronic control system, computer logic), and/or control system calibrations, and/or the results of systems interactions, and/or hardware items on a motor vehicle or motor vehicle engine, as defined in 40 C.F.R. § 86.1803-01.

"Emission-Related Calibrations" means software calibrations programed and installed by the Original Equipment Manufacturer ("OEM") in Motor Vehicles and/or Motor Vehicle Engines for parameters that can affect emissions, including but not limited to the following calibrations:

      i.  calibrations for parameters that affect the operation of the Exhaust Gas Recirculation System ("EGR") System, including EGR flowrate and EGR cooler bypassing;

      ii.  calibrations for parameters that affect the operation of the DPF, DOC, Selective Catalytic Reduction System ("SCR"), and/or NOx Adsorber Catalyst ("NAC");

      iii. calibrations for parameters that affect engine combustion, performance, and operation, including air-fuel ratio, fuel injection timing, fuel quantity, fuel injection pulse width, fuel injection pressure, fuel injection mass, multiple injection patterns, open loop/closed loop functionality and control, ignition control – (spark timing), boost pressure, limiters (fuel, torque, smoke, etc.), manifold pressure, camshaft timing, electronic throttle control, engine air flow characteristics, mass air flow rate,

7

turbocharger/supercharger air flow, and other parameters disclosed on the COC which are elements of the OEM's strategy to control the formation of pollutants in the engine; and

iv. calibrations for parameters that affect On-Board Diagnostics System ("OBD") detection, warning, and recording of malfunctions.

"Emission-Related Element of Design" means any part, device, or element of design installed on or in a motor vehicle or motor vehicle engine by an OEM for the specific purpose of controlling emissions or which must function properly to assure continued vehicle emission compliance, including but not limited to:

i. On-Board Diagnostics System or OBD;

ii. Diagnostic Trouble Codes or DTCs;

iii. Oxygen sensors;

iv. NOx sensors;

v. Ammonia sensors;

vi. Particulate Matter sensors or PM sensors;

vii. Urea quality sensors;

viii. Exhaust gas temperature sensors;

ix. DPF differential pressure sensors;

x. Exhaust Gas Recirculation System or EGR;

xi. Diesel Oxidation Catalysts or DOCs;

xii. Selective Catalytic Reduction System or SCR;

xiii. Diesel Particulate Filter or DPF;

xiv. NOx Adsorber Catalyst System or NAC;

xv. Emission-Related Calibrations;

8

xvi. AECDs; and

xvii. Any other part, device, or element of design installed in compliance with Title II of the CAA and its regulations.  "EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

"Excepted Subject Product" is defined in Paragraph 15.

"Exhaust Gas Recirculation System" or "EGR" means all hardware, components, parts, sensors, subassemblies, software, AECDs, and calibrations that collectively constitute the system for controlling NOx emissions by recirculating a portion of engine exhaust gas into the cylinders of an engine.

"Financial Information" means the documentation and other information submitted by Defendant to the United States on June 11, 2021, July 27, 2021, and March 28, 2022.

"Guarantors" means Brian George and Michael Mitchell in their individual capacities.

"Guaranty" means the payment of any unpaid portion of the Civil Penalty, any stipulated penalties arising from late or non-payment of such unpaid portion of the Civil Penalty, and all interest accrued on such amounts in accordance with the terms of this Consent Decree, by the Guarantors in the event that Defendant defaults as to these payment obligations, as set forth in Paragraph 13.

"Marketing Materials" means all materials or communications containing or conveying information prepared or used by the Defendant to discuss, describe, or explain any of Defendant's products, in any form, including but not limited to electronic and hardcopy information used in advertisements, training materials, online videos (e.g., YouTube), social media webpages (e.g., Facebook, Instagram), and user manuals or guides.

9

"NOx Adsorber Catalyst System" or "NAC" means the strategy for controlling NOx emissions from partial lean burn gasoline engines and from diesel engines by adsorbing the NOx emissions onto a catalyst substrate during lean combustion followed by periodic regeneration of the substrate during short, richer-than stoichiometric combustion, together with all hardware, components, parts, sensors, subassemblies, software, AECDs, and calibrations that collectively constitute the system for implementing this control strategy.

"On-Board Diagnostics System" or "OBD" means the strategy for monitoring the functions and performance of the emission control system and all other systems and components that must be monitored under 40 C.F.R. § 86.1806-05 and 40 C.F.R. § 86.1806-17, for identifying and detecting malfunctions of such monitored systems and components, and for alerting the driver of such potential malfunctions by illuminating the malfunction indicator light ("MIL"), together with all hardware, components, parts, sensors, subassemblies, software, AECDs, and calibrations that collectively constitute the system for implementing this strategy.

"Original Equipment Manufacturer" or "OEM" means the manufacturer responsible for the design and production of a motor vehicle or motor vehicle engine.

"Paragraph" means a portion of this Decree identified by an Arabic numeral.

"Parties" means the United States and Defendant.

"Permanently Delete and/or Destroy" means (a) in the case of hardware, to crush the device and all of its parts or components to render them useless; and (b) in the case of software or firmware, to completely and permanently erase all programming and information.

"Section" means a portion of this Decree identified by a Roman numeral.

"Selective Catalytic Reduction System" or "SCR" means all hardware, components, parts, sensors, sub-assemblies, software, AECDs, calibrations, and other elements of design that

10

collectively constitute the system for controlling NOx emissions through catalytic reduction using an ammonia-based diesel exhaust fluid ("DEF") as the reducing agent, including without limitation all hardware, components, parts, sensors, subassemblies, software, AECDs, calibrations, and other Elements of Design relating to (1) the DEF storage tank, (2) the DEF injectors, (3) the dosing control unit, and (4) the SCR catalysts assembly.

"Subject Product" means any motor vehicle part, component or product manufactured, sold or offered for sale within the United States, a principal effect of which is to bypass, defeat, or render inoperative a motor vehicle emission control device or Emission-Related Element of Design, including, but not limited to, hardware, software, tunes, calibrations, or other programming (and devices on which such software, tunes, calibrations, or other programming are loaded). For the avoidance of doubt, Subject Products include, but are not limited to: software, tunes, calibrations, or other programming that enable an Emission-Related Element of Design to be removed, disabled, or bypassed, or otherwise affect one or more Emission-Related Elements of Design; and motor vehicle parts, components, or products that interfere with the function of, or allow removal of, one or more Emission-Related Elements of Design.

"United States" means the United States of America, acting on behalf of EPA.

## V.    CIVIL PENALTY

11.    Defendant shall pay the sum of $500,000 as a civil penalty, together with interest accruing from the date of lodging of this Consent Decree, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging, on the schedule set forth in this Paragraph.

a.    Not later than 30 days after the Effective Date, Defendant shall pay $200,000, plus an additional sum for interest on that amount calculated from the date of lodging;

11

       b.     Not later than one year after the Effective Date, Defendant shall pay $150,000, plus an additional sum for interest on that amount calculated from the date of lodging;

       c.     Not later than two years after the Effective Date, Defendant shall pay $150,000, plus an additional sum for interest on that amount calculated from the date of lodging.

12.     Defendant shall pay the civil penalty due by FedWire to the DOJ account, in accordance with instructions provided to Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Eastern District of California after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendant shall use to identify all payments required to be made in accordance with this Consent Decree.  The FLU will provide the payment instructions to:

> Justin Savage
> Sidley Austin LLP
> 1501 K Street, N.W.
> Washington, D.C. 20005
> jsavage@sidley.com

> Nicole Noelliste
> Sidley Austin LLP
> 1501 K Street, N.W.
> Washington, D.C. 20005
> nnoelliste@sidley.com

on behalf of Defendant.  Defendant may change the individual to receive payment instructions on its behalf by providing written notice of such change to DOJ and EPA in accordance with Section XIV (Notices).

At the time of payment, Defendant shall send notice that payment has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to DOJ via email or regular mail in accordance with Section XIV (Notices); and (iii) to EPA in accordance with Section XIV (Notices).  Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States v. Sinister Mfg. Company, Inc.* and shall reference the civil action number, CDCS Number, and DOJ case number 90-5-2-1-12092.

13.     <u>Guaranty</u>.  The Guarantors hereby guarantee payment of all payment and/or penalty obligations in Paragraph 11 (Civil Penalty), Paragraph 37 (Stipulated Penalties) (but only to the extent a stipulated penalty arises from the late or non-payment of any portion of the Civil Penalty), and Paragraph 41 (Interest on Civil Penalty Payments) on behalf of Defendant. This is a continuing Guaranty as to which each Guarantor is jointly and severally liable and shall remain in full force and effect until all payments under such paragraphs have been fully paid. Guarantors, by their signatures below, each agree to jurisdiction of this Court for the purposes of enforcing the Guaranty pursuant to this Consent Decree.  In the event Defendant defaults on any payment and/or penalty obligations under Paragraph 11 (Civil Penalty), Paragraph 37 (Stipulated Penalties) (but only to the extent a stipulated penalty arises from the late or non-payment of any portion of the Civil Penalty), and Paragraph 41 (Interest on Civil Penalty Payments), the United States shall be entitled to immediately pursue its rights to enforce this Guaranty in any appropriate legal forum and Guarantors and Defendant agree not to challenge the United States' enforcement of this Guaranty.

14.     Defendant shall not deduct any penalties paid under this Decree pursuant to this Section or Section VIII (Failure to Comply With Consent Decree) in calculating its federal income tax.

## VI.     COMPLIANCE REQUIREMENTS

15.     <u>Excepted Subject Products</u>.  A product that would otherwise be a Subject Product is an Excepted Subject Product if one or more of the following is true:

a.              Defendant has obtained a CARB EO for the product prior to manufacture, sale, offering for sale, or installation within the United States; provided that CARB has not cancelled, withdrawn, or otherwise rendered ineffective such CARB EO.

b.              Defendant has submitted a Complete Application to CARB that covers the product prior to manufacture, sale, offering for sale, or installation, provided, however, that:

(1)      If CARB denies or Defendant withdraws any Complete Application for a CARB EO submitted under this Paragraph, the product shall not be an Excepted Subject Product.  Defendant shall immediately cease manufacturing and selling that product, shall notify all Authorized Dealers that continued sales of the product may constitute violations of the Act, and shall take other reasonable efforts to remove that product from commerce.  For the purposes of this sub-paragraph, denial shall mean a letter from CARB conveying notice of denial; and

14

(2)     A product shall not be an Excepted Subject Product
if the application is still pending two or more years
after submittal or CARB has not acted on the
application because Defendant failed to provide
information.  EPA may, in its unreviewable
discretion, extend the deadline under this sub-
Paragraph upon written request of the Defendant;

c.     The manufacturer, if not Defendant, has obtained a CARB EO for the
product prior to manufacture for other than prototype use, sale, offering for sale, or installation
for other than prototype use, which Defendant has verified by locating the relevant CARB EO on
CARB's Executive Orders, Certifications, & Verifications website, located at
https://ww2.arb.ca.gov/executive-orders-certifications-verifications; or

d.     The manufacturer, if not Defendant, prior to manufacture, sale, offering
for sale, or installation, provides Defendant with either 1) evidence establishing that the
manufacturer has performed independent emission testing, pursuant to a Consent Decree or
administrative settlement with EPA, of the product that demonstrates that the product does not
adversely affect emissions, including copies of the testing plan and laboratory results and
analysis; 2) a Consent Decree or administrative settlement that prohibits the product from
containing any user-adjustable features for any emissions control device or Emissions-Related
Element of Design accompanied by a written certification from the manufacturer as set forth in
Paragraph 33 herein that the manufacturer is in compliance with this requirement; provided,
however, that upon termination of such Consent Decree or administrative settlement, or upon
notification by EPA of noncompliance with such Consent Decree or administrative settlement,

15

the product shall no longer be an Excepted Subject Product.

16.     <u>Prohibition on manufacture, sale, offer for sale, and installation of Covered</u> <u>Subject Products</u>.  After the Effective Date, Defendant shall not manufacture, sell, offer to sell, or install any Covered Subject Product in the United States.

17.     <u>Destruction of Covered Subject Products</u>.  No later than 30 days after the Effective Date, Defendant shall Permanently Delete and/or Destroy all Covered Subject Products in its possession or control, including those Covered Subject Products forfeited by employees and officers of Defendant pursuant to Paragraph 26.  Notwithstanding the foregoing, this Paragraph does not apply to products that are present outside the United States on the Effective Date.

18.     <u>Prohibition on Tampering</u>.  After the Effective Date, Defendant shall not remove or render inoperative any device or Emission-Related Element of Design that has been installed on or in a motor vehicle or motor vehicle engine in compliance with the CAA; provided that this Paragraph shall not apply to Excepted Subject Products.

19.     <u>Prohibition on Technical Support and Warranty for all Covered Subject Products</u>. After the Effective Date, Defendant shall not offer or make available any Technical Support or other information (including Marketing Materials) pertaining to the installation, manufacture, sale, use, or repair of any Covered Subject Product and shall deny all warranty claims pertaining to any Covered Subject Product.

20.     <u>Revision of Marketing Materials</u>.  Defendant shall revise all Marketing Materials as necessary to ensure that, not later than 30 days after the Effective Date, such materials do not include any information, including but not limited to instructions or demonstrations, that pertains

or relates in any way to replacing, overwriting, deleting, bypassing, defeating, or otherwise rendering inoperative any emission control device or Emission-Related Element of Design.

21.     <u>Instructions to Authorized Dealers</u>.  No later than 30 Days after the Effective Date, Defendant shall (a) notify all Authorized Dealers that Defendant is no longer honoring warranty claims pertaining to any Covered Subject Product and that Defendant is no longer supplying Technical Support pertaining to the installation, manufacture, sale, use, or repair of any Covered Subject Product; and (b) instruct all Authorized Dealers to refuse to honor any warranty claims pertaining to any Covered Subject Product and to refuse to supply any Technical Support or other information (including Marketing Materials) pertaining to the installation, manufacture, sale, use, or repair of any Covered Subject Product.

22.     Notwithstanding the requirements of Paragraphs 19 and 21, Defendant and any Authorized Dealers may assist customers in removing any Covered Subject Products from vehicles on which they were installed and returning such vehicles to the OEM settings. Defendant and any Authorized Dealers may provide Technical Support to customers that does not involve the installation, manufacture, sale, use, or repair of Covered Subject Products.

23.     <u>Notice to Authorized Dealers and Covered Subject Product Customers</u>.  No later than 30 Days after the Effective Date, Defendant shall transmit a notice that includes the language specified in Appendix B to (a) each Authorized Dealer and (b) each end-use customer whose contact information Sinister possesses to which a Covered Subject Product was sold on or after October 30, 2015.

24.     <u>Notice to Employees</u>.  No later than 30 Days after the Effective Date, Defendant shall post a written notice of applicable Clean Air Act prohibitions, incorporating language contained in Appendix C to this Decree, in conspicuous locations, both physical and electronic,

17

where Defendant's officers and employees will regularly encounter it.  These postings must include both hardcopy postings in a physical location and on-line, electronic postings.

25.    <u>Training of Employees</u>.  No later than 30 Days after the Effective Date, and continuing on an annual basis thereafter, Defendant shall conduct a Clean Air Act Compliance Training Program for all officers, employees, contractors, and consultants (hereinafter, "trainees").  Defendant shall be permitted to retain external contractors or consultants to assist with or to conduct the Training Program.  The Training Program shall:

a.        Include detailed information regarding:

(1)      The Compliance Requirements set forth in Section VI of this Consent Decree;

(2)      The acts prohibited by Section 203(a)(3) of the Act, 42 U.S.C. § 7522(a)(3), including the statutory language of Section 203(a)(3);

(3)      The categories of potentially liable persons under the Act, including individuals;

(4)      The relevant maximum civil penalties for each violation of Section 203(a)(3)(A) and 203(a)(3)(B), as adjusted for inflation in 40 C.F.R. Part 19; and

(5)      The acts prohibited by Section 113(c)(2) of the Act, 42 U.S.C. § 7413(c)(2), including the statutory language of that Section and the criminal penalties set forth therein;

b.        Consist of at least two hours of in-person training; provided, however, that

18

in the event of a public health emergency, Defendant may conduct training via video- or audio-enabled teleconference, webinar, or similar live-session method;

c.      Provide the trainees with a written summary of all training content, including the information required in Paragraph 25.a; and

d.      Require all trainees to acknowledge, in writing, that they participated in the training session and received a written summary of all content as required by Paragraph 25.c.

26.     <u>Requirement of Employees to Forfeit Covered Subject Products</u>.  No later than 30 Days after the Effective Date, Defendant shall require each officer and employee of the Defendant to forfeit any Covered Subject Product in his or her possession, or installed on any motor vehicle owned or operated by him or her or under his or her control, by returning such Covered Subject Product to an individual designated by Defendant and identified to EPA for such purpose.

27.     <u>Prohibition on Transfer of Intellectual Property</u>.  After the Effective Date, Defendant shall not offer for sale, sell, convey, or otherwise transfer in any way the design, source code, technology, manufacturing process, or other intellectual property associated with any Covered Subject Product, except as part of a submission to CARB, in response to a request from the United States, or as otherwise required by law.

28.     <u>Certification of Compliance With Commitment</u>.  By signing this Decree, Defendant certifies under penalty of law that it has not manufactured, sold, offered for sale, installed, or distributed any of the products listed in Paragraph 1 of the Commitment since the date of the last certification it submitted pursuant to that Commitment, which completes the obligation to complete certifications under the Commitment.

19

29.   <u>Decree Not a Compliance Determination</u>.  Defendant shall not state or imply in any way that, as a result of this Consent Decree, any product is covered by a compliance determination (or similar designation) from EPA.

30.   <u>Permits</u>.  Where any compliance obligation under this Section requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. Defendant may seek relief under the provisions of Section IX (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VII.   REPORTING REQUIREMENTS

31.   By January 31st of the calendar year after the Effective Date, and continuing on an annual basis until termination of this Decree pursuant to Section XVIII (Termination), Defendant shall submit to EPA and DOJ at the e-mail addresses set forth in Section XIV (Notices) an annual progress report for the preceding twelve months (except that the first annual progress report shall also, for the requirements of Paragraph 31.c, cover the period from April 30, 2020 to the end of the period covered by such report).  The annual progress report shall include, but is not limited to, the following: A statement regarding the status of the payment of (i) the civil penalties and associated Interest pursuant to Paragraph 11 and (ii) any stipulated penalties owing pursuant to Section VIII (Failure to Comply With Consent Decree);

a.     As to Covered Subject Products that were deleted or destroyed during the Reporting Period pursuant to Paragraph 17 (Destruction of Covered Subject Products), a list of

all hardware products, including product names, type, serial numbers, and date of destruction;

b.       A list of all software, data, or other information that was destroyed or deleted, including the type of software, data, or other information and the date of destruction or deletion;

c.       A complete copy of Defendant's purchase and sale records for the Reporting Period covering all parts or components intended for use with, or as part of, any motor vehicle or motor vehicle engine.  Unless EPA agrees otherwise, this shall be in the form of an electronic data export from an electronic database.  For each part or component included in the purchase and sale records, Defendant shall identify the part or component as:

(1)       An engine tuner

(2)       An engine tune

(3)       A hardware product

(4)       A Covered Subject Product, an Excepted Subject Product (including the basis for this designation, with specific reference to the relevant subparagraph and subparagraph part of Paragraph 15, and CARB EO number, Complete Application designation, or Consent Decree or administrative settlement), or neither;

d.       A list of all CARB Executive Orders for which Sinister has submitted during the Reporting Period, or plans to submit within the next Reporting Period, a Complete Application, or that Sinister has received since the Effective Date.  Such list shall also include any CARB Executive Order that has been issued for a product manufactured by someone other

21

than Defendant but which Defendant sold, offered for sale, or installed during the Reporting Period.

  e.   A list of all Consent Decrees or administrative settlement agreements that, under Paragraph 15.d, render a Subject Product an Excepted Subject Product, along with a copy of each such Consent Decree or administrative settlement and the required documentation of independent emission testing pursuant to Paragraph 15.d(1) or certification of compliance by the manufacturer pursuant to Paragraph 15.d(2), as applicable. Such list shall include the case title, docket number, and district (if judicial) of the Consent Decree or administrative settlement and shall identify the corresponding part by name, product type, and SKU.

  f.   A list of all Authorized Dealers to whom Defendant provided instructions pursuant to Paragraph 21 during the Reporting Period and a copy of any such instructions provided;

  g.   A list of all Authorized Dealers and end-use customers to whom Defendant provided a notification pursuant to Paragraph 23 during the Reporting Period and a copy of any such notification provided;

  h.   A copy of the written notice required to be posted pursuant to Paragraph 24 and a description of the manner of posting (or continued posting if posted in a prior Reporting Period) during the Reporting Period;

  i.   A list of all officers, employees, contractors and consultants who participated in the Clean Air Act Compliance Training Program during the Reporting Period, pursuant to Paragraph 25 and a copies of the training acknowledgments signed by the participants; provided, however, that if the California Consumer Privacy Act of 2018, Cal. Civ. Code 1.81.5, is amended such that the inclusion of personal information of Defendant's

employees and/or contractors in an Annual Report under this Paragraph is prohibited, Sinister and EPA shall consult to determine and agree on an appropriate modification of this Paragraph, which shall be deemed a non-material modification of the Consent Decree. ; and

  j.  A list of all products that, during the Reporting Period, were forfeited in accordance with Paragraph 26, the name of the individual to whom the products were delivered for forfeiture, and documentation of the destruction or deletion of such products as set forth in Paragraph 17;

  k.  A description of any non-compliance with the requirements of this Consent Decree during the Reporting Period and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, Defendant shall so state in the report.  Defendant shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day Defendant becomes aware of the cause of the violation.  Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section IX (Force Majeure).

  32.  Whenever any violation of this Consent Decree or any other event affecting Defendant's performance under this Decree may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify EPA by telephone at (415) 972-3308 or by email to chan.janice@epa.gov as soon as possible, but no later than 24 hours after Defendant first knew of the violation or event.  This procedure is in addition to the requirements set forth in the preceding Paragraph.

33.     Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I have no personal knowledge that the information submitted is other than true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

34.     This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

35.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

36.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

VIII.   FAILURE TO COMPLY WITH CONSENT DECREE

37.     Defendant shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified in the table below, unless excused under Section IX (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Failure to pay any amount of the civil penalty required to be paid under Section V (Civil Penalty) when due. | $1,000 per Day for the first 30 Days of noncompliance, $2,000 per Day thereafter. |
| Manufacture, sale, offer for sale, or installation of any Covered Subject Product in violation of the requirements of Paragraph 16 (Prohibition on Manufacture, Sale, Offer for Sale, and Installation of Covered Subject Products). | For the first 100 Covered Subject Products, $2,500 per Covered Subject Product manufactured, sold, offered for sale or installed.  For each Covered Subject Product thereafter, $4,500 per Covered Subject Product manufactured, sold, or installed. |
| Failure to comply with the requirements of Paragraph 17 (Destruction of Covered Subject Products) | $2,000 per Day for the first 30 Days of noncompliance; $4,000 per Day thereafter. |
| Providing technical support or honoring warranty claim in violation of Paragraph 19 (Prohibition on Technical Support and Warranty for all Covered Subject Products) | $2,500 per instance in which technical support is provided or a warranty is honored. |
| Failure to revise Marketing Materials in violation of Paragraph 20 (Revision of Marketing Materials) | $1,000 for each instance of a noncompliant Marketing Material per Day for the first 30 Days of noncompliance; $2,000 for each such instance per Day thereafter. |
| Failure to provide notice as required by Paragraph  21 (Instructions to Authorized Dealers) | $500 per Day for the first 30 Days of noncompliance; $1,500 per Day thereafter. |
| Failure to notify Authorized Dealers and customers as required by Paragraph 23 (Notice to Authorized Dealers and Covered Subject Product Customers) | $2500 per Day for each Day of noncompliance. |
| Failure to comply with the requirements of Paragraph 24 (Notice to Employees) | $500 per Day for the first 30 Days of noncompliance; $2,500 per Day thereafter. |
| Failure to comply with the requirements of Paragraph 25 (Training of Employees) | $750 per trainee. |
| Failure to comply with the requirements of Paragraph 26 (Requirement of Employees to Forfeit Covered Subject Products) | $500 per Day for the first 30 Days of noncompliance; $2,500 per Day thereafter. |
| Transfer of Intellectual Property in violation of Paragraph 27 (Prohibition on transfer of Intellectual Property) | $500,000 or two times the gross amount received from the transfer, whichever is greater. |
| Failure to submit an Annual Report, or failure to submit a complete and accurate Annual Report, in violation of Section VII (Reporting Requirements) | $500 per day for the first 15 Days of noncompliance for each violation of the reporting requirements, $1,500 for the 16th through 30th Days of noncompliance |

25

| | for each violation of the reporting requirements, and $3,000 per Day thereafter for each violation of the reporting requirements. |
|---|---|

38.     Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

39.     Defendant shall pay any stipulated penalty within 30 Days of receiving the United States' written demand.

40.     The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

41.     <u>Interest on Civil Penalty Payments</u>.  In addition to the Stipulated Penalty set forth in Paragraph 38, if Defendant fails to make any payment required by Paragraph 11 (Civil Penalty) by the required due date, all remaining installment payments and all accrued interest shall become due immediately upon such failure. Interest shall continue to accrue on any unpaid amounts until the total amount due has been received.

42.     Stipulated penalties shall continue to accrue as provided in Paragraph 38 during any Dispute Resolution, but need not be paid until the following:

a.     If the dispute is resolved by agreement of the Parties or by a decision of EPA that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

b.     If the dispute is appealed to the Court and the United States prevails in

26

whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c., below.

       c.            If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

       43.     <u>Obligations Prior to the Effective Date</u>.  Upon the Effective Date, the stipulated penalty provisions of this Decree shall be retroactively enforceable with regard to violations of Paragraph 16 (Prohibition on the Manufacture, Sale, Offer for Sale, and Installation of Covered Subject Products) that have occurred after April 30, 2020 but prior to the Effective Date as a result of Defendant's noncompliance with the Commitment, provided that stipulated penalties that may have accrued prior to the Effective Date may not be collected unless and until this Consent Decree is entered by the Court.

       44.     Defendant shall pay stipulated penalties owing to the United States in the manner set forth in Paragraph 12 and with the confirmation notices required by Paragraph 13, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

       45.     If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

46.     The payment of penalties and interest, if any, shall not alter in any way Defendant's obligation to complete the performance of the requirements of this Consent Decree.

47.     <u>Non-Exclusivity of Remedy</u>.  Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree.  Subject to the provisions of Section XII (Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to seek any other relief it deems appropriate for Defendant's violation of this Decree or applicable law, including but not limited to an action against Defendant for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt.  However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## IX.     FORCE MAJEURE

48.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, which delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

49.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice by electronic transmission to Janice Chan at <u>chan.janice@epa.gov</u> within 72

28

hours of when Defendant first knew that the event might cause a delay.  Within ten Days thereafter, Defendant shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare, or the environment.  Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

50.    If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

51.    If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendant in writing of its decision.

29

52.      If Defendant elects to invoke the dispute resolution procedures set forth in

Section X (Dispute Resolution), it shall do so no later than 20 Days after receipt of EPA's notice.

In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of

the evidence that the delay or anticipated delay has been or will be caused by a force majeure

event, that the duration of the delay or the extension sought was or will be warranted under the

circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and

that Defendant complied with the requirements of Paragraphs 48 and 49.  If Defendant carries

this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected

obligation of this Consent Decree identified to EPA and the Court.

## X.      DISPUTE RESOLUTION

53.      Unless otherwise expressly provided for in this Consent Decree, the dispute

resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising

under or with respect to this Consent Decree.  Defendant's failure to seek resolution of a dispute

under this Section shall preclude Defendant from raising any such issue as a defense to an action

by the United States to enforce any obligation of Defendant arising under this Decree.

54.      Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under

this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be

considered to have arisen when Defendant sends DOJ and EPA a written Notice of Dispute.

Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal

negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is

modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations,

then the position advanced by the United States shall be considered binding unless, within 30

30

Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

55.     Formal Dispute Resolution.  Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by sending DOJ and EPA a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

56.     The United States shall send Defendant its Statement of Position within 45 Days of receipt of Defendant's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

57.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIV (Notices), a motion requesting judicial resolution of the dispute.  The motion must be filed within thirty (30) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

31

58.     The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court.  Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

59.     <u>Standard of Review</u>.  In any dispute brought under this Decree, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree, and better furthers the Objectives of the Consent Decree.

60.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 42.  If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Failure to Comply With Consent Decree).

## XI.     INFORMATION COLLECTION AND RETENTION

61.     Defendant hereby certifies that, to the best of its knowledge and belief, after thorough inquiry, it has submitted to EPA Financial Information that fairly, accurately, and materially sets forth its financial circumstances, and that those circumstances have not materially changed between the time the Financial Information was submitted to EPA and the time Defendant executes this Consent Decree.

62.     The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility owned or operated by Defendant, at all reasonable times, upon presentation of credentials, to:

    a.          monitor the progress of activities required under this Consent Decree;

b.          verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c.          obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

d.          obtain documentary evidence, including photographs and similar data; and

e.          assess Defendant's compliance with this Consent Decree.

63.     Until four years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant's performance of its obligations under this Consent Decree.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

64.     At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, Defendant shall deliver any such documents, records, or other information to EPA.  Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Defendant asserts such a privilege, it shall provide the following:

33

(a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendant.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

65.    Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

66.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

67.    This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the date of lodging.

68.    Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to reinstitute or reopen this action, or to commence a new action seeking relief in addition to that provided in this Consent Decree, if the Financial Information provided by Defendant, or the certification made by Defendant in Paragraph 61, is false or, in any material respect, inaccurate.

34

69.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 67.

70.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, or other appropriate relief relating to the Defendant's alleged violations, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 67.

71.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, 42 U.S.C. § 7401, et seq., or with any other provisions of federal, State, or local laws, regulations, or permits.

72.     This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties not party to this Consent Decree, nor does it limit the

rights of third parties not party to this Consent Decree against Defendant, except as otherwise provided by law.

73.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIII.   COSTS

74.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## XIV.   NOTICES

75.     Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and sent by mail or email (with a preference for email), addressed as follows:

| | |
|---|---|
| As to DOJ by email: | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-5-2-1-12092 |
| As to DOJ by mail: | EES Case Management Unit<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C.  20044-7611<br>Re: DJ # 90-5-2-1-12092 |
| As to EPA by email: | Chan.Janice@epa.gov |
| As to EPA by mail: | Enforcement and Compliance Assurance Division<br>(Mail Code ENF-2-1)<br>U.S. Environmental Protection Agency, Region IX<br>75 Hawthorne Street<br>San Francisco, CA 94105 |

As to Defendant:                    Justin Savage
                                    Sidley Austin LLP
                                    1501 K Street, N.W.
                                    Washington, D.C. 20005
                                     jsavage@sidley.com

                                    Nicole Noelliste
                                    Sidley Austin LLP
                                    1501 K Street, N.W.
                                    Washington, D.C. 20005
                                    nnoelliste@sidley.com

76.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

77.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing or transmission by email, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XV.   EFFECTIVE DATE

78.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Defendant hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective Date as set forth in the Commitment.  In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date as set forth in the Commitment shall terminate.

## XVI.   RETENTION OF JURISDICTION

79.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections X (Dispute Resolution) and XVII (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XVII.   MODIFICATION

80.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

81.     Any disputes concerning modification of this Decree shall be resolved pursuant to Section X (Dispute Resolution); provided, however, that, instead of the burden of proof provided by Paragraph 59, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVIII. TERMINATION

82.     After Defendant has completed the requirements of Section VI (Compliance Requirements), has thereafter maintained continuous satisfactory compliance with this Consent Decree for a period of four (4) years, and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendant may serve upon the United States a Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

83.     Following receipt by the United States of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties

may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

84.     If the United States does not agree that the Decree may be terminated, Defendant may invoke Dispute Resolution under Section X (Dispute Resolution).  However, Defendant shall not seek Dispute Resolution of any dispute regarding termination until 90 Days after service of its Request for Termination.

## XIX.   PUBLIC PARTICIPATION

85.     This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Decree.

## XX.   SIGNATORIES/SERVICE

86.     Each undersigned representative of Defendant and the Assistant Attorney General for the Environment and Natural Resources Division of DOJ certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

87.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendant need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXI.   INTEGRATION

88.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.

## XXII.  FINAL JUDGMENT

89.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendant.

## XXIII. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

90.     For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section II (Applicability), Paragraph 7; Section VI (Compliance Requirements), Paragraphs 15 - 21 and 23 - 28; Section VII (Reporting Requirements), Paragraphs 31 - 33; Section VIII (Failure to Comply With Consent Decree), Paragraph 43; and Section XI (Information Collection and Retention), Paragraphs 61 - 64, is restitution or required to come into compliance with law.

## XXIV. APPENDICES

91.     The following Appendices are attached to and part of this Consent Decree:

a.          "Appendix A" is the Commitment;

b.          "Appendix B" is the required language for the Notice to Authorized

Dealers and Covered Subject Product Customers for purposes of Paragraph 23; and

c.          "Appendix C" is the required language for the Notice to Employees for

purposes of Paragraph 24.

Dated and entered this __ day of _____, 20__

_____

UNITED STATES DISTRICT JUDGE

FOR THE UNITED STATES OF AMERICA:

TODD S. KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC  20044-7611

Date:   June 2, 2023

*Eric Albert or*
Eric D. Albert, Senior Attorney
Joanna Day, Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC  20044-7611
202-514-2800 (direct)
Eric.albert@usdoj.gov
Joanna.day@usdoj.gov

42

Consent Decree in *United States v. Sinister Mfg Company, Inc.*

FOR THE U.S. ENVIRONMENTAL PROTECTION
AGENCY:

Sylvia Quast                                          4/25/23
Regional Counsel
U.S. Environmental Protection Agency, Region 9

David H. Kim                                          4/25/23
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 9
Office of Regional Counsel

43

Consent Decree in *United States v. Sinister Mfg Company, Inc.*

FOR SINISTER MFG. COMPANY, INC.:

$S$-31-23
Date

Brian George
Individually, and as Chief Executive Officer of
Sinister Mfg. Company, Inc.

44

FOR GUARANTORS:

5/31/23
Date

Michael Mitchell
In his individual capacity

45

*Settlement Confidential – Confidential Business Information*
*Subject to Fed. R. Evid. 408*

## APPENDIX A
## <u>Stop Sale Commitment</u>

1. For sales within the United States, Sinister Mfg. Company, Inc. (the Company) agrees to stop the manufacture, sale, offering for sale, installation, and/or distribution of the following categories of products beginning no later than April 30, 2020:

   a. EGR delete hardware or similar products that physically remove, bypass, disable, or otherwise render inoperative the EGR system.

   b. Exhaust emission control delete hardware (i.e., any product that physically removes, bypasses, disables, or otherwise renders inoperative the DOC, DPF, NOx Absorber Catalyst, and/or SCR system).

   c. Subject to Paragraph 2 below, tuning products that disable or allow removal of stock emission control systems or related OBD sensors (including, but not limited to, tuners pre-loaded with tunes that disable or allow the removal of stock emission control systems without illuminating a malfunction indicator lamp, prompting any diagnostic trouble code, or triggering any engine derating, or blank tuners sold with hardware delete kits).

2. Consistent with EPA's June 25, 1974 Interim Tampering Enforcement Policy (Memo 1A), the Company may continue to market and sell tuning products that the Company "has a reasonable basis for knowing . . . will not adversely affect emissions performance" as those terms are defined in Memo 1A or in a future update to Memo 1A issued by EPA, if any. The Company shall be deemed to have a "reasonable basis for knowing" that tuners with Executive Orders (EOs) from the California Air Resources Board "will not adversely affect emissions performance."

3. Not later than May 15, 2020 and every three months thereafter, the Company will provide the United States with the attached certification of compliance, including a report of any non-compliance with this agreement. The certification must include a statement attesting to the truthfulness and accuracy of the report signed under penalty of perjury.

4. At the United States' request, the Company agrees to this commitment as part of ongoing civil settlement negotiations in an effort to explore whether a reasonable resolution is possible in this matter with the United States. The Company neither admits, nor denies, any allegation by the United States relating to this commitment, including the lawfulness of prior sales, and reserves any claims and defenses related to this matter and any related matters.

_3-9-2020_
Date                                      [signature block]

**APPENDIX B**
**CONSENT DECREE IN UNITED STATES V. SINISTER MFG. COMPANY, INC.**

[SINISTER
LETTERHEAD]


[SINISTER Customer or Authorized Dealer Name]
[SINISTER Customer or Authorized
Dealer Address Line 1]
[SINISTER Customer or Authorized
Dealer Address Line 2]


Dear [Customer or Authorized Dealer Name]:

On April 30, 2020, Sinister Mfg. Company, Inc. ("SINISTER") voluntarily stopped the sale and manufacture of certain types of exhaust gas recirculation delete hardware or similar products, exhaust emission control delete hardware products, and tuning products ("Subject Products"). SINISTER ceased those sales because EPA alleged that the manufacture and sale of Subject Products violated the Clean Air Act's prohibition against motor vehicle parts or components that allow for bypassing, defeating or rendering inoperative any emissions control system or element of design on a vehicle. *See* 42 U.S.C. §7522(a)(3). Emissions control systems include the diesel particulate filter, exhaust gas recirculation system, catalysts, and onboard diagnostic system.

SINISTER recently entered into a civil judicial settlement with EPA to resolve disputes regarding its pre-April 30, 2020 manufacturing, sale and installation of Subject Products. Although SINISTER has not admitted liability for violating the Clean Air Act, as part of the settlement it has agreed that, among other things, it will no longer (1) manufacture, sell, or install the Subject Products or (2) provide technical support (e.g., telephone support, online/chat support, warranty support) for the Subject Products. SINISTER has also agreed to provide you with this notice.

SINISTER's settlement with EPA specifically allows for SINISTER to continue selling emissions-related products that are covered by Executive Orders issued by the California Air Resources Board ("CARB") or by certain pending applications for CARB Executive Orders. SINISTER currently sells various products that are available on SINISTER's website, www.SinisterDiesel.com.


Sincerely,


[SINISTER Representative TBD]

**APPENDIX C**

**NOTICE OF CONSENT DECREE IN UNITED
STATES v. SINISTER MFG. COMPANY, INC.**

TO: ALL OFFICERS, DIRECTORS, AND EMPLOYEES OF SINISTER MFG. COMPANY, INC.

Sinister Mfg. Company, Inc. ("SINISTER") has entered into a civil judicial settlement with the federal government regarding the manufacture, sale, and installation of certain types of exhaust gas recirculation delete hardware or similar products, exhaust emission control delete hardware products, and tuning products

The United States Environmental Protection Agency ("EPA") has asserted that the manufacture, sale, and installation of any part or component intended for use with a motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative emission control devices or elements of design, such as diesel particulate filters, exhaust gas recirculation systems, and onboard diagnostic systems, is prohibited.

Anyone who undertakes any of the actions prohibited by Section 203(a)(3)(A) or (B) of the Clean Air Act, 42 U.S.C. § 7522, or who offers for sale, sells, conveys, or otherwise transfers in any way the design, technology, or manufacturing processes or techniques used to manufacture the products identified above may be subject to enforcement and sanctions under the Clean Air Act.

---

**42 U.S. Code Section 7522**

**(a) Enumerated prohibitions**

The following acts and the causing thereof are prohibited—

(3)(A) for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser; or

(3)(B) for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.